**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| ELIZABETH MURPHY and<br>CHRISTOPHER MURPHY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No.: 2:08-CV-1078 |
| v. | ) | |
| | ) | |
| | ) | **ORDER** |
| JEFFERSON PILOT | ) | |
| COMMUNICATIONS COMPANY | ) | |
| n/k/a LINCOLN FINANCIAL | ) | |
| COMMUNICATIONS COMPANY, | ) | |
| WCSC INC., d/b/a WCSC CHANNEL 5, | ) | |
| and LIBERTY MUTUAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on Defendant Liberty Mutual Insurance Company's ("Liberty Mutual") Motion for Judgment on the Pleadings, Defendant Jefferson Pilot Communications Company ("Jefferson Pilot") and WCSC Channel 5's ("WCSC") Motion to Dismiss, and Plaintiffs Elizabeth and Christopher Murray's ("Plaintiffs") Motion to Remand. For the reasons set forth herein, Plaintiffs' Motion to Remand is denied, Defendant Jefferson Pilot and WCSC's Motion to Dismiss is granted, and Defendant Liberty Mutual's Motion for Judgment on the Pleadings is held to be moot.

**BACKGROUND**

Donald Feldman ("Feldman") was the "Assistant VP News" for Jefferson Pilot and news director for WCSC, which was owned by Jefferson Pilot. He reported directly to Jefferson Pilot's General Manager. As part of his duties as news director, he oversaw a program called "Carolina Gang," a panel show which focused on local political issues. Feldman met a local attorney, Sandra

Senn ("Senn"), and asked her to become a regular panelist for the show. She agreed, and began appearing regularly on the show.

Senn had formerly been employed by the Stuckey Law Firm, but had recently left the firm under contentious circumstances. Senn appears to have had a particularly acrimonious relationship with Plaintiff Elizabeth Murphy ("Murphy"), who was also an attorney at the firm. Senn apparently voiced her frustrations over her relationships with both Murphy individually and the Stuckey firm overall in private conversations with Feldman.

In what was apparently an attempt to impress Senn, Feldman phoned Senn on July 23, 1999, and told her that he had just gotten off a flight from Charleston to Atlanta, and that Murphy had also been a passenger on the flight. Feldman reported that while on the flight, Murphy, who was traveling with a man who was not her husband, had gotten extremely intoxicated and had loudly made defamatory statements to other passengers about Senn's personal life and bedroom habits as well as her professional competence and demeanor.

Feldman later e-mailed Senn telling her that he would not stand for Murphy's behavior and slanderous statements regarding Senn, and that he was going to get involved to make sure that Murphy realized she could no longer behave in this fashion. Feldman later told Senn that he had sent a letter to Murphy, and provided Senn with a copy of the letter. The letter was printed on WCSC letterhead and addressed to Murphy,[1] and threatened legal action due to Murphy's "slanderous" comments aboard the flight in question. The letter invoked the fact that Senn was "a WCSC Air Personality," and stated that it was in the best interests of WCSC to protect the reputations of its on-air personnel. He claimed that he was seeking a passenger list from the flight

---

[1] Murphy was then known as Elizabeth Stuckey.

in question to prove that Murphy was on the flight and to uncover the identity of Murphy's alleged paramour, as well as to prove that Murphy had been drinking to excess aboard the flight.  He also claimed that he would use the passenger list to discover which passengers had been sitting near Murphy so as to have overheard her comments, and would interview them to see if it had negatively impacted their view of either WCSC or Senn.  After this information was discovered, Feldman claimed he was going to seek the counsel of WCSC's legal department to see if any legal action could be taken against Murphy.  Feldman concluded the letter by hinting that he would be willing to enter into settlement negotiations with Murphy so as to avoid a potential lawsuit against her.  The letter was signed, "Donald M. Feldman, Vice-President/News Director."  Feldman later reported to Senn that Murphy had taken him up on his offer of possibly settling the matter, and that Murphy had come to the station several times to talk to him about the possibility of entering into a settlement agreement, and Feldman and Senn even worked together on drafting the terms of a tentative settlement agreement.  In September, Senn took the copy of the letter given to her by Feldman to the attorney representing her in her dispute with the Stuckey Law Firm, and requested that he handle any potential claim arising from the incident on the airplane as well.  Her attorney contacted the Stuckey Law Firm's attorney about the incident, and produced a copy of the letter, which the law firm's attorney then passed along to Murphy.

The letter's reports of her scandalous and malicious behavior aboard the flight came as some surprise to Murphy, who had in fact been in Charleston attending a soccer game and birthday party during the flight.  Feldman, in what appears to have been a bizarre attempt to impress or woo Senn, fabricated the entirety of the events and allegations in question, and was never in possession of any sort of damning evidence regarding Murphy.  However, Feldman stuck to his story as it was

3

questioned by Murphy's attorney, who had contacted WCSC's counsel and general manager regarding the letter and allegations. Feldman stated that the allegations were in fact true and that sending the letter was necessary to protect WCSC's integrity, and that WCSC's former station manager had approved the contents of the letter. In November 2000, Feldman was arrested for embezzling more than $2 million from WCSC, and around this time it became clear to all involved that Feldman had, in fact, fabricated the entire incident and all allegations about Murphy's conduct.

Murphy was severely affected by Feldman's untruthful allegations about her, and experienced severe depression that dramatically affected her quality of life, her marriage, and forced her to abandon the practice of law. In 2001, Plaintiffs filed a lawsuit against Jefferson Pilot, WCSC, and Feldman in the Charleston County Court of Common Pleas, alleging that Feldman had defamed Murphy while acting within the scope of his employment, and committed intentional infliction of emotional distress. The initial jury trial took eight days, at the conclusion of which, on May 21, 2003, the trial judge granted WCSC and Jefferson Pilot's motions for a directed verdict on public policy grounds. The only issue submitted to the jury, therefore, was the issue of Feldman's liability. The jury returned a verdict against Feldman in the amount of just over $9 million.

Liberty Mutual had retained attorney Patrick Higgins ("Higgins") to represent Feldman in this matter. However, Feldman, on his own, retained attorney Coming Gibbs ("Gibbs") to represent him. In May 2002, Feldman specifically notified Liberty Mutual that he "intends not to cooperate or discuss this case with anyone at Liberty Mutual and/or any counsel they may retain concerning this matter." (Def.'s Mem. Ex. C.) He also specifically requested that Liberty Mutual not provide counsel for him. Finally, he notified Liberty Mutual that he "specifically waives any coverage which may be available to him under any policies issued by Liberty Mutual Insurance Company."

4

*Id.* Based on this communication, on September 4, 2002, Liberty Mutual therefore denied Feldman

any coverage to which he may have otherwise been entitled, and also instructed Higgins to withdraw

from any representation of Feldman.  Higgins filed a motion to withdraw as counsel in state court,

and the motion was granted without opposition from either side.

After the verdict against him, Feldman filed for Chapter 7 bankruptcy.  In September 2005,

the United States Bankruptcy Court filed an Order of Discharge pertaining to his debts.

Plaintiffs appealed the trial court's grant of a directed verdict as to their claims against

WCSC and Jefferson Pilot.  On appeal, the South Carolina Court of Appeals reversed this decision

of the trial court, and remanded the case back to the Charleston County Court of Common Pleas for

a new trial against WCSC and Jefferson Pilot.  *Murphy v. Jefferson Pilot Commc'ns Co.*, 364 S.C.

453, 613 S.E.2d 808 (Ct. App. 2005).  The retrial occurred in September 2007.  At the outset of this

trial, Plaintiffs filed a "Motion to Establish Facts" seeking to establish that the only issue to be

decided by the second trial was whether Feldman's actions occurred within the scope of his

employment with WCSC and Jefferson Pilot.  The court denied this, ruling that the issue of damages

was to be retried, and informed Plaintiffs' counsel that if they wished to continue to litigate the issue

of the appropriate scope of the second trial, they should appeal this ruling before the trial started.

Plaintiffs' attorney declined this opportunity to file an interlocutory appeal, and explicitly

acknowledged at a hearing that he understood that by going forward he was waiving his right to

contest the trial court's decision.  At the conclusion of the trial, the jury found that WCSC and

Jefferson Pilot were liable for Feldman's behavior, and ordered them to pay almost $4 million to

Plaintiffs.  Defendants appealed this judgment, and that appeal is currently pending in state court.

Defendants have paid the damages, which are being held by the state court until the appeal is resolved.

In February 2008, Feldman assigned all rights pertaining to his policy with Liberty Mutual to Plaintiffs.

Plaintiffs commenced this action on February 26, 2008, seeking to enforce the original $9 million judgment against Feldman obtained in the first trial against Defendants.  Plaintiffs' complaint also consisted of original allegations of breach of contract, civil conspiracy and intentional interference with a contractual relationship, as well as pursuing Feldman's assigned claims.  On March 31, Defendants removed this case to this court, asserting that WCSC had been fraudulently joined, and therefore there was diversity of citizenship between Plaintiffs and Jefferson Pilot and Liberty Mutual.  Also on March 31, Liberty Mutual filed a Motion for Judgment on the Pleadings, to which Plaintiffs responded on April 18.  March 31 also saw Jefferson Pilot and WCSC file a Motion to Dismiss, to which Plaintiffs also responded on April 18.  On April 15, Plaintiffs filed a Motion to Remand the matter back to the Charleston County Court of Common Pleas, to which Defendants filed two separate responses on April 28.  Plaintiffs filed a Reply to Defendants' Responses on May 8.

## ANALYSIS

### I.     Motion to Remand

If this court lacks jurisdiction over this action, then it has no authority to decide the substantive merits of Plaintiffs' claims.  Therefore, the court will first address Plaintiffs' Motion to Remand.

The burden of demonstrating jurisdiction resides with "the party seeking removal." *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 2004) (citing *Mulcahey v. Columbia Organic Chems. Co.,* 29 F.3d 148, 151 (4th Cir. 1994)). The court is obliged to construe removal jurisdiction strictly because of the "significant federalism concerns" implicated. *Id.* Therefore, "[i]f federal jurisdiction is doubtful, a remand [to state court] is necessary." *Id.*

Section 1441 of Title 28 provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). In this case, Defendant alleges that removal was proper because the district court had original jurisdiction to hear Plaintiff's case under 28 U.S.C. § 1331. Section 1331 grants district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Thus, the court must decide whether Plaintiff's claims "aris[e] under the Constitution, laws, or treaties of the United States." *Id.*

Section 1447(c) of the United States Code provides that, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." Plaintiffs assert that this court lacks subject matter jurisdiction because Defendant WCSC, like Plaintiffs, is a citizen of the state of South Carolina. Defendants argue that WCSC has been fraudulently joined to this case, and that Plaintiffs cannot recover from WCSC. Defendants claim that Plaintiffs can possibly recover any damages only from the other Defendants, which are citizens of jurisdictions other than South Carolina.

"To show fraudulent joinder, the removing party must demonstrate either (1) outright fraud in the plaintiff's pleading of jurisdictional facts or (2) that there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant in state court." *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir.1999) (internal quotation marks omitted). "The party alleging fraudulent joinder bears a heavy burden--it must show that the plaintiff cannot establish a claim even after resolving all issues of law and fact in the plaintiff's favor." *Id.* "This standard is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)(6)." *Id.* The plaintiff need not establish that he will ultimately succeed on his claims; "[t]here need be only a slight possibility of a right to relief." *Id.* at 425. In order to determine whether a pleading is fraudulent, the Court is not bound by the allegations of the pleadings, but instead it may consider the entire record and may resolve the issue by any means available. *AIDS Counseling & Testing Centers v. Group W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir.1990).

A.      *Statute of Limitations*

The first issue that must be addressed by the court is whether Plaintiffs' claims against WCSC are barred by the statute of limitations. "If a statute of limitation has run on a cause of action against a non-diverse defendant, the doctrine of fraudulent joinder may apply." *Shaffer v. Northwestern Mut. Life Ins. Co.*, 394 F. Supp. 2d 814, 818 (D. Md. 2005). Plaintiffs' claims "must be commenced within three years after [they] knew or by reasonable diligence should have known that [they] had a cause of action." S.C. Code Ann. § 15-3-535.

Plaintiffs filed this action in state court on February 26, 2008. The underlying events of this case occurred well over three years prior to the filing of this action. However, Plaintiffs assert that the statute of limitations was not running during the entirety of this period.

The court first turns to the issue of whether Plaintiffs' original claims against Defendants, the claims for civil conspiracy and for intentional interference with a contractual relationship, are barred by the statute of limitations. Both of these causes of action were assigned to Plaintiffs by Feldman. Since they were assigned to Plaintiffs, Plaintiffs can have no greater rights on these claims than Feldman himself would have had had Feldman chosen to pursue the claims himself. *Moore v. Weinberg,* 373 S.C. 209, 220, 644 S.E.2d 740, 745 (Ct. App. 2007) ("An assignee stands in the shoes of its assignor."); *see also Twelfth RMA Partners, L.P. v. Nat'l Safe Corp.*, 335 S.C. 635, 639-40, 518 S.E.2d 44, 46 (Ct. App. 1999) ("[T]he assignee should have all the same rights and privileges . . . as the assignor."). The crux of these claims is that Defendants interfered with Feldman's right to recover on his insurance policy and intimidated him into refusing the coverage to which he was rightfully entitled. However, Feldman's coverage with Liberty Mutual only applied to liability incurred while acting within the scope of his employment, so he would have had no right to any action taken outside of the scope of his position as news director with WCSC. Plaintiffs assert that while it is true that Feldman did not pursue a claim against Defendants for some time after he was denied coverage, the statute of limitations was not running during this time because until May 2, 2005, when the Court of Appeals decision was handed down, the trial court's directed verdict constituted a holding that Feldman was not acting within the scope of his employment, and therefore Feldman could have reasonably assumed that he could not recover on the present claims as a matter of law.

A statute of limitations may be equitably tolled in situations where it would be fundamentally unjust to hold a plaintiff responsible for filing a claim. *See, e.g.*, *Harris v. Hutchinson*, 209 F.3d 325, 328 (4th Cir. 2000) ("As a general matter, principles of equitable tolling may, in the proper circumstances, apply to excuse a plaintiff's failure to comply with the strict requirements of a statute of limitations."). However, equitable tolling should be used sparingly, and "any invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes." *Id.* at 330.

The facts of this case go beyond mere "individualized hardship," as it would be fundamentally unfair for a statute of limitations to be running on a claim where a fundamental underlying basis of that claim was held to be invalid by a court of law. Feldman cannot have been expected, then, to have filed any claim relating to his insurance policy with Liberty Mutual after the trial court granted WCSC and Jefferson Pilot's motion for directed verdict at trial, as the court held that no issue of material fact existed as to whether or not Feldman was acting within the scope of his employment. It was not until the South Carolina Court of Appeals overturned the trial court's grant of a directed verdict on May 2, 2005, that the issue of whether or not Feldman had been acting within the scope of his employment was in question again. At this point, Feldman had notice that he could have made a claim regarding Feldman's insurance policy with Liberty Mutual. They eventually filed this claim on February 26, 2008, almost 34 months after the decision of the Court of Appeals.

However, Plaintiffs fail to account for the time period between the initial denial of coverage, on September 4, 2002, and the trial court's decision on the directed verdict motions in May 21, 2003. Plaintiffs assert that no claim could have been made on the claim prior to the decision of the court

10

of appeals on May 2, 2005, because prior to that it had been decided as a matter of law that Feldman's actions were not within the scope of his employment. This contention is simply untrue. The issue of whether the behavior was within the scope of Feldman's employment had not been decided prior to May 21, 2003, and all sides were in fact litigating this very issue prior to that date. For the more than eight months between the denial of coverage and the trial court's ruling, then, Feldman was free to file a suit relating to his insurance coverage. In short, then, the statute of limitations on any insurance claims Feldman or his assignees had regarding the Liberty Mutual policy ran from the date of the denial of coverage on September 4, 2002 until the claim was filed on February 26, 2008, and was tolled during the period between the trial court's ruling on May 21, 2003 and the court of appeals ruling on May 16, 2005. Since this period, when taking into account the time that elapsed between the denial of coverage and the trial court's ruling, and the time that elapsed between the court of appeals decision and the filing of the complaint in the present case, comprises a time period of more than three years, the trial court's ruling on the directed verdict motions is not, by itself, enough to overcome Defendants' statute of limitations defense to Plaintiffs' breach of contract and civil conspiracy claims.

However, South Carolina also adheres to the discovery rule for purposes of determining the statute of limitations. "Under the discovery rule, the statute of limitations begins to run from the date the injured party either knows or should know, by the exercise of reasonable diligence, that a cause of action exists for the wrongful conduct." *Epstein v. Brown*, 363 S.C. 372, 376, 610 S.E.2d 816, 818 (2005). *See also Anonymous Taxpayer v. South Carolina Dept. Of Revenue*, 377 S.C. 425, 438, 661 S.E.2d 73, 80 (2008) ("The limitations period begins to run when a party knows or should know, through the exercise of due diligence, that a cause of action might exist.").

11

Plaintiffs assert that they did not discover the facts that form the underlying basis of their claims for civil conspiracy and intentional interference with a contractual relationship until Gibbs testified at an in camera hearing during the first trial as to Defendants' alleged intimidation of Feldman. However, the statute of limitations applies to the claim itself, not the party bringing the action. *See, e.g.*, *State v. McClinton*, 369 S.C. 167, 173, 631 S.E.2d 895, 898 (2006) ("A statute of limitations generally begins to run *on the date a cause of action accrues . . .*"). Since "[a]n assignee stands in the shoes of its assignor," *Moore,* 373 S.C. at 220, 644 S.E.2d at 745, the relevant inquiry for when the statute of limitations began to run is not when the Plaintiffs knew or should have known that they had the basis for an interference with contractual relationship and civil conspiracy claim, but rather when Feldman knew or should have known of such a claim.[2] *See, e.g.*, *Strauser v. Westfield Ins. Co.*, 827 N.E.2d 1181, 1185 (Ind. Ct. App. 2005) ("A cause of action brought by an assignee of another's claims accrues at the same time that the assignor's claims accrued.").

According to Plaintiffs' Amended Complaint:

After these cases were filed, an agent of Jefferson Pilot Communications Company, WCSC, Inc., and Liberty Mutual Insurance Company engaged in conduct which

---

[2] The need for this rule is obvious, but important enough to bear emphasis–if any assignment of a claim served to reset the statute of limitations, anyone could assign or sell a claim for which the statute of limitations had long expired so long as the assignee did not know about the basis for claim. The purpose of statutes of limitations in civil actions is to prevent plaintiffs from sitting on their rights for excessive periods of time, and to avoid the inequity of defendants having to defend against historical claims when facts have been forgotten and evidence has been lost or disposed of. The facts of the present case serve as an illustration of this concern, as Feldman was aware of the alleged intimidation and conspiracy when he gave his affidavit in May 2002. If the statute of limitations on his claims ran from that date until it was tolled by the trial court's directed verdict in May 2003, and then began running again when the Court of Appeals issued its decision on May 16, 2005, then the statute of limitations on Feldman's claims would have run out in May 2007, more than eight months before he assigned these claims to Plaintiffs. Therefore, to rule for Plaintiffs would essentially be ruling that an assignment of claims could serve to resuscitate time-barred claims.

12

threatened and intimidated Donald Feldman. This conduct resulted in Mr. Feldman not cooperating with Liberty Mutual Insurance Company, and because of Mr. Feldman's non-cooperation, Liberty Mutual denied coverage for Mr. Feldman. Liberty Mutual and the other corporate defendants also denied that Mr. Feldman was acting as the officer, agent, and employee of the corporate defendants at the time any defamatory statements were made by Mr. Feldman about Elizabeth Murphy and for this reason coverage was also denied.

(Pls.' Am. Compl. ¶ 8.) Plaintiffs assert that the attorney for WCSC made threats towards Feldman that if Feldman took any action that would have been detrimental to the station, including cooperation with Liberty Mutual, the attorney could use personal connections with the sentencing judge to increase Feldman's sentence in retaliation. Plaintiffs allege that they did not discover any of this until Gibbs gave in camera testimony during the initial trial in May 21, 2003 regarding these efforts at intimidation. However, the inescapable fact is that Feldman was aware of the basis for these claims in May 2002, when he gave an affidavit saying that he did not wish to cooperate with Liberty Mutual and waived his right to coverage under the policy. (Def.'s Ex. D.) At the very latest, Feldman was aware of the basis for these claims on September 2, 2002, when his insurance coverage was formally denied by Liberty Mutual. Therefore, the statute of limitations began running when Feldman knew or should have known the basis of any possible claims for civil conspiracy and intentional interference with a contractual relationship, and ran until the trial court's decision on the motion for a directed verdict on May 21, 2003, when it was tolled because a ruling of law that Feldman was not acting within the scope of his employment made any claim upon the Liberty Mutual insurance policy impracticable. However, as explained above, any claim upon the policy became actionable once again when the Court of Appeals issued its May 16, 2005 decision overturning the trial court's legal determination that Feldman had not been acting within the scope of his employment, and the statute of limitations began running once again. Therefore, the three

13

year statute of limitations upon Plaintiffs' claims of civil conspiracy and intentional interference

with a contractual relationship expired, at the latest, in September 2007. Since the claim was not

filed until February 2008, these causes of action against WCSC are therefore untimely and barred.

        B.      *Breach of Contract and Breach of Covenant of Good Faith Claim*s

        Plaintiffs have also brought a cause of action against all Defendants, including WCSC, for

breach of insurance contract and breach of the covenant of good faith and fair dealing in relation to

the contract. However, there is no allegation anywhere in Plaintiffs' pleadings that WCSC was a

party to the contract in question. Only parties to a contract may be sued for a breach of contract

cause of action. *See, e.g.*, *Chan v. Thompson*, 302 S.C. 285, 292, 395 S.E.2d 731, 735-36 (Ct. App.

1990) ("The companies were not parties to the contracts relied upon by the Thompsons. Since they

were not parties to the contracts a judgment for breach of contract cannot be rendered against

them."). WCSC and Jefferson Pilot provided the insurance contract to its employees, officers, and

agents acting within the scope of their employment through the insurer, Liberty Mutual. "An

insurance policy is a contract between the insured and the insurance company, and the terms of the

policy are to be construed according to contract law." *Coakley v. Horace Mann Ins. Co.*, 376 S.C.

2, 5-6, 656 S.E.2d 17, 18-19 (2007). Therefore, just as the general principles of contract law provide

that non-creditor intended beneficiaries may only bring causes of action against the promisee who

is responsible for providing the benefit to the beneficiary, and not against the promisor who arranged

for the benefit, the insured only has a breach of contract action against the insurer, and not the

employer who provided the insurance. The contract was for Liberty Mutual to indemnify Feldman

for tort liability incurred within the course and scope of his employment, and WCSC played no part

in the decision to deny coverage to Feldman. Accordingly, Feldman would have had no cause of

action against WCSC for breach of insurance contract, and Plaintiffs' assigned claim on these grounds fails for identical reasons.

For the same reason, Plaintiffs' bad faith cause of action against WCSC also fails as a matter of law. "[T]he implied covenant of good faith and fair dealing is not an independent cause of action separate from the claim of breach of contract." *Rotec Servs. v. Encompass Servs., Inc.*, 359 S.C. 467, 471-73, 597 S.E.2d 881, 883-84 (Ct. App. 2004). *Cf. Charleston Dry Cleaners & Laundry, Inc. v. Zurich Am. Ins. Co.*, 355 S.C. 614, 617-18, 586 S.E.2d 586, 588 (2003) ("In South Carolina, although the insurer owes the insured a duty of good faith and fair dealing, this duty of good faith arising under the contract does not extend to a person who is not a party of the insurance contract.") (citations omitted). Since WCSC was not a party to the insurance contract in question, and could therefore not be liable for a breach of insurance contract, it can therefore also not be liable for a breach of the covenant of good faith arising out of said contract, since no such covenant existed.

Accordingly, Plaintiffs' causes of action for breach of contract and breach of the covenant of good faith arising out of the insurance policy against WCSC fail as a matter of law.

C.    *Claim Seeking to Enforce Judgment of First Trial Against Defendants*

Plaintiffs' lone remaining claim against Defendants, then, is their claim to enforce the $9 million judgment against Feldman from the first trial against these Defendants under the doctrine of respondeat superior. Plaintiffs argue that since it is established under South Carolina law that a master may be liable for the actions of a servant operating within the scope of their employment, and that the jury in the second trial explicitly found that Feldman defamed Murphy while acting within the scope of his employment with WCSC and Jefferson Pilot, then the verdict in the first case should also be imputed to Defendants. Plaintiffs assert that Defendants are barred by collateral estoppel

15

from contesting the issue of vicarious liability, since the second jury's verdict constitutes a clear decision of law on the issue.

In support of this position, Plaintiffs can cite to only one case, *Blue Valley Creamery Co. v. Cronimus*, a case decided by the Kentucky Court of Appeals in 1937.  270 Ky. 496, 110 S.W.2d 286 (1937).  The somewhat complicated facts of that case are as follows.  There was a car accident between a truck owned by Blue Valley Creamery Company ("BVC"), driven by BVC's agent, Jenkins, and a truck owned by Cronimus, driven by Cronimus' agent, Bohn.  Bohn and a passenger who was in the truck with him at the time of the accident filed a lawsuit against BVC for personal injuries suffered by them in the accident, alleging that the accident had been caused by Jenkins' negligence.  BVC raised a contributory negligence defense, claiming that the accident had in fact been caused by Bohn's negligence.  At the conclusion of this trial, judgment was entered in favor of Bohn and his passenger, constituting a legal finding that Jenkins' negligence had been the cause of the accident.  Shortly after the conclusion of this trial, BVC filed suit against Cronimus seeking to recover damages for the damage done to BVC's truck.  Cronimus filed a counter-claim against BVC for the damage done to its truck.  The judge in the second matter found that the issue of who was at fault for the accident had already been established as a matter of law in the first trial, and that since BVC's argument against Cronimus was wholly dependent upon respondeat superior liability for the alleged negligence of Bohn, BVC was bound by *res judicata*, and was estopped from relitigating the issue of whose negligence caused the accident in the second matter.

Plaintiffs submit that this case is relevant to the present matter because Defendants, like BVC, are seeking to relitigate a previously decided issue of negligence.  Since the first trial established that Feldman's defamation had caused damage to Plaintiffs, and the second trial

16

established that Feldman's actions took place within the scope of his employment, Plaintiffs assert that Defendants cannot seek to re-open the issue of whether they are liable for the actions of Feldman.

As an initial matter, the court notes that a decision from over 70 years ago from an intermediate state court in another jurisdiction is of very limited precedential value to this court. Furthermore, Plaintiffs seem to misunderstand Defendants' legal position. Defendants do not claim that Feldman was not acting within the scope of his employment and that no liability should be imposed upon them for Feldman's actions. On the contrary, Defendants explicitly concede that the issue has been decided as a matter of law by the second trial. Rather, they are arguing that liability already has been imposed upon them, in the amount of the $4 million verdict in the second case, and that they should not also be held liable for the verdict in the first case. Defendants assert that the initial judgment against Feldman was discharged years ago in Feldman's subsequent bankruptcy proceeding, that this issue was decided as a matter of law by the trial court in the second trial, and Plaintiffs thus have no right or ability to enforce that judgment against Defendants today.

Defendants assert that Plaintiffs should be estopped from trying to enforce the judgment from the first trial against Defendants, because Plaintiffs raised this issue during the second trial and received an adverse ruling, which they chose not to appeal. On September 4, 2006, Plaintiffs submitted a "Motion to Establish Certain Facts Based on Doctrine of Collateral Estoppel and Res Judicata." (Defs.' Ex. K.) Plaintiffs asserted that "The jury [in the first trial] found Feldman's actions proximately caused damages to the Plaintiff and awarded her $9,009,268.00 in damages. The allegations against Jefferson Pilot are identical to the allegations against Feldman. As such, the issues of liability and damages have been litigated and determined and Jefferson Pilot is estopped

17

from relitigating those issues." *Id.* Plaintiffs sought to have the second trial limited only to a single issue–whether or not Feldman had been acting within the scope of his employment with WCSC and Jefferson Pilot.

Plaintiffs overlook the fact that WCSC and Jefferson Pilot had been dismissed as Defendants from the case at the conclusion of evidence, and thus did not have the opportunity to make closing arguments to the jury, and, more significantly, would not have had the right to appeal the $9 million verdict. A review of the first trial's transcript reveals a number of instances where WCSC and Jefferson Pilot, had they still been involved with the case, would have significantly altered the arguments presented in the case or objected to what was being said in open court. For one, Feldman's attorney openly stated he was not concerned with any financial liability incurred by his client, saying "The outcome of this civil litigation is not an important thing to Mr. Feldman at this stage. My job here is to make sure, best I can, that nothing occurs in this courtroom that would result in an additional or more severe prison sentence. That is the only interest Mr. Feldman has in this case, and that is the interest I am going to be protecting. As a result of that, I am not going to take . . . an active part in the defense of this case." (Def.'s Ex. L at 4.)

During closing arguments in the trial, Feldman's attorney informed the jury that Feldman was on the verge of insolvency and could not afford to pay any judgment entered against him, and that in returning a damages figure, the jury would "simply be making a statement and would not be realistic in any way." *Id.* When the Plaintiffs' attorney gave his closing argument, he stated that, "we're not going to collect this verdict from Mr. Feldman. It's not going to be done. . . . But your verdict will send a message." *Id.* The clear message given by attorneys from both sides to the jury

18

was that the amount of damages they were to decide upon was purely symbolic, and would never be enforced.

It would be absurd, therefore, to suggest either that Feldman adequately represented WCSC's interests when he explicitly stated that he had no stake in the amount of damages awarded, or that WCSC had a right to litigate the damage award, when it had no opportunity to object to or appeal the ultimate jury decision to award $9 million in damages. The very essence of the legal doctrine of privity is to avoid relitigating issues where a side's interests have been adequately represented, but it would fly in the face of every principle and purpose of the doctrine to rule that WCSC and Jefferson Pilot had been in privity with Feldman at the first trial when Feldman's counsel had stated from the outset of the trial and again during closing argument that his client could afford to pay no verdict against him, and that any damages amount the jury could come up with "would simply be making a statement." Therefore, the court must conclude that Defendants' interests were not represented at all before the jury in the first trial–to hold otherwise would be fundamentally unfair and would quite possibly constitute a violation of Defendants' due process rights.

Recognizing this, the trial court in the second trial in this matter ruled against the Plaintiffs. The judge ruled from the bench on Plaintiffs' Motion to Establish Facts, and following dialogue took place between the court and Mr. Parker, Plaintiffs' attorney:

> THE COURT: There is none because you elected–you wanted a trial *de novo*. Let's put this on the record. The defendant have [sic] been maintaining from the get-go that you believe that you are entitled to a new trial.
>
> MR. KERR [Defendants' Attorney]: Yeah.
>
> THE COURT: On all issues. And the plaintiff moved to limit this trial but, given further consideration, you elected for a trial *de novo*.

19

MR. PARKER [Plaintiffs' Attorney]: Yes, Your Honor. What we really wanted was to wait and make that decision at the end of the case.

THE COURT: I appreciate that but you...

MR. PARKER: We understand the court's ruling.

THE COURT: We are not going to go forward and preserve something for review. You have elected–the court said that *if we went forward that the plaintiff, by that, has waived any right to argue that it should have been just simply on one issue.*

MR. PARKER: We understand.

THE COURT: Do you agree with that?

MR. PARKER: I don't agree with the ruling but I agree that's what the court's ruling was.

THE COURT: Well, I am just asking you. *Because if you're not, we can stop and you can appeal that issue and then we will go forward.*

MR. PARKER: No, sir. I don't intend to–I understand the court's ruling.

THE COURT: All right. Because I think what it amounts to is, at the end, you aren't going to say "I don't like the way that it went down. I'd rather go back and have it the way that we had it." That is just–you are not going to be in that situation.

(Defs.' Ex. K) (emphasis added).

It is quite clear from this colloquy that the trial court explicitly rejected Plaintiffs' argument that Defendants should be responsible for the liability imposed upon Feldman in the first trial, and instead stated that the second trial was a "trial *de novo*," meaning that the issues of scope of employment and damages would be tried anew without any regard for what happened in the first trial. The court also made it very clear to Plaintiffs that it was a binding legal decision, and that if Plaintiffs wished to appeal it, they would be given an opportunity to file an interlocutory appeal on the issue. However, the court informed Plaintiffs that if they did not appeal the issue at that time,

they would lose the ability to contest the issue further. Plaintiffs' attorney responded that while he did not agree with the decision, he understood it and would not contest it.

This court is bound by the Full Faith and Credit Clause of Article IV of the United States Constitution and 28 U.S.C. § 1738 to honor the decisions of state courts. "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Allen v. McCurry*, 449 U.S. 90, 96 (1980).

The doctrine of *res judicata* encompasses two similar but distinct concepts–claim preclusion and issue preclusion. Issue preclusion "forecloses the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation." *Sedlack v. Braswell Servs. Group, Inc.*, 134 F.3d 219, 224 (4th Cir. 1998). On the other hand, "[r]ules of claim preclusion provide that if the later litigation arises from the same cause of action as the first, then the judgment bars litigation not only of every matter actually adjudicated in the earlier case, but also of every claim that might have been presented." *In re Varat Enters., Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996). Since this litigation is legally distinct from both of the two state court cases, claim preclusion does not apply to this case. However, issue preclusion does apply to the issue at hand. *See also id.* ("Issue preclusion is more narrow and applies when the later litigation arises from a different cause of action. It operates to bar subsequent litigation of those legal and factual issues common to both actions that were 'actually and necessarily determined by a court of competent jurisdiction' in the first litigation.") (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)). "[I]ssue preclusion is proper if the issue in question was presented in a prior adjudicatory proceeding in which the party against whom preclusion is sought had a full and fair opportunity to

litigate the issue." *Robinson v. Metts*, 86 F. Supp. 2d 557, 562 (D.S.C. 1997) (quoting *Stall v. Bourne*, 774 F.2d 657, 663 (4th Cir. 1985)) (citations omitted).

Here, the underlying legal issue that the Plaintiffs presented to the state court on the eve of the second trial and the issue that Plaintiffs present to this court in the present action are the same. In their Motion to Establish Certain Facts, Plaintiffs sought to have the trial court determine as a matter of law that if the jury were to find that Feldman acted within the scope of his employment, the Defendants should be liable for the $9 million verdict in the first trial. The judge clearly rejected this argument, informing Plaintiffs that the issue of the extent of the harm suffered by Plaintiffs and the damages which should be awarded to them would be decided *de novo* by the jury, and that if Plaintiffs wished to continue to litigate this issue they would be given leave to file an interlocutory appeal. Plaintiffs acknowledged an understanding of this ruling and informed the trial court that they would not be contesting the issue and wished to continue with the trial. After winning the $4 million verdict, Plaintiffs appealed neither the extent of that verdict nor the trial court's decision to ignore the damages award in the initial trial and send the issue of damages to the jury. In the present litigation, Plaintiffs assert that since the second jury found that Feldman was acting within the scope of his employment, his tort liability from the first trial should automatically be imputed to Defendants.

This was precisely the same argument made to and rejected by the state court in the second trial, and which Plaintiffs did not appeal. Plaintiffs had a full and fair opportunity to litigate this issue on its merits, and the issue was ruled upon by a competent court of general jurisdiction. If Plaintiffs had attempted to relitigate this issue in state court, they would have been barred from doing so by *res judicata*. Therefore, this court is also bound by the Supreme Court's ruling in *Allen*

22

*v. McCurry* to give full faith and credit to that court's decision.  Accordingly, the fact that Feldman was found to have been acting within the scope of his employment with WCSC and Jefferson Pilot by the jury in the second trial does not automatically render WCSC and Jefferson Pilot responsible for the $9 million damages verdict in the first trial, as the trial court determined as a matter of law that that figure was illegitimate as applied to Defendants and should be decided anew by the jury at the second trial.

Furthermore, the court notes that accepting Plaintiffs' argument and ruling in Plaintiffs' favor would represent an absurd windfall for the Plaintiffs.  Even setting aside the underlying issue of whether the harm done to Plaintiffs was worth $13 million in damages, the court notes that if Plaintiffs were to prevail in this litigation, they would receive more in damages than they would have received if they had prevailed on the relevant legal issue in either the first or the second trial. In the first trial, if the trial court had not granted Defendants' motions for a directed verdict, Plaintiffs would have obtained a judgment against Defendants and Feldman, who would have been jointly and severally liable for a figure of at most $9 million.[3]  In the second trial, if the trial court had ruled in Defendants' favor and limited the scope of the trial to the single of issue of whether Feldman had been acting within the scope of his employment, the issue of compensatory damages would never have gone to the jury, and the Plaintiffs, upon obtaining a favorable verdict on the scope of employment issue, would have simply been entitled to the $9 million verdict from the first trial.  Instead, having lost at the trial level on both of those issues, Plaintiffs now apparently seek to

---

[3] Without delving too deeply into the realm of the hypothetical, the court notes as a matter of common sense that it is highly likely that the jury's $9 million damages figure would have been somewhat lower had Defendants been able to represent their interests, and had the jury not been explicitly told by both Feldman's and Plaintiffs' attorneys that any award was purely symbolic and would never actually be recovered.

recover both the $4 million verdict from the second trial (which has already been paid into state court pending the outcome of the appeal of that verdict) as well as the $9 million verdict from the first case.  Such a result would represent a windfall award to Plaintiffs far above and beyond what either of the two juries determined to be adequate compensation for the actual damage done to Plaintiffs by Feldman's actions, and must fail as a matter of law.[4]

Therefore, all of Plaintiffs' causes of action against WCSC fail as a matter of law, and there is no possibility of recovering any monetary damages from WCSC.  This logically entails that WCSC is not a genuine party in interest to this case, and was fraudulently joined.  Accordingly, diversity does exist among the parties, and this court retains jurisdiction over this matter.  Plaintiffs' Motion to Remand is hereby denied.

## II.    Defendants WCSC and Jefferson Pilot's Motion to Dismiss

Furthermore, the standard for a court's decision on whether a plaintiff has any possibility of recovering from a defendant for the purposes of determining whether the defendant has been fraudulently joined or not is even more forgiving for the plaintiff than the standard for determining whether a valid claim for relief has been put forth under Federal Rule 12.  *See Hartley v. CSX Transp., Inc.*, 187 F.3d 422 (4th Cir. 1999) ("This standard is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6).").  Since, as the court has explained above, Plaintiffs' claims against WCSC all fail as a matter of law such that WCSC was fraudulently joined to this action as a party, the court must also logically conclude that

---

[4] Because the court holds that Plaintiffs cause of action to recover the $9 million verdict from the first trial against Defendants fails because it was ruled upon by the state court prior to the second trial, the court need not and does not rule upon  Defendants' argument that this claim also fails as a matter of law because the $9 million verdict was discharged by Feldman's bankruptcy proceeding.

Plaintiffs' claims against WCSC all fail as a matter of law such that WCSC's Motion to Dismiss under Rule 12(b)(6) is granted, and WCSC is hereby dismissed as a party to this case.

Furthermore, in none of Plaintiffs' pleadings or allegations do they make any sort of material legal or factual distinction between WCSC and Jefferson Pilot. Both of these Defendants, who jointly employed Feldman, are being sued on the same grounds–that they had employed Feldman, and that they had jointly participated in actions which constituted civil conspiracy and interference with a contractual relationship. Since the legal claims against the two parties were identical, the court must also therefore hold that Plaintiffs' claims against Jefferson Pilot (now known as Lincoln Financial Communications Company) fail as a matter of law, and Jefferson Pilot's Motion to Dismiss is granted and it is no longer a party to this case.

Accordingly, Defendants WCSC and Jefferson Pilot's Motion to Dismiss this action pursuant to Federal Rule 12(b)(6) is hereby granted, and Plaintiffs' claims against them are dismissed.

## III.     Defendant Liberty Mutual's Motion for Judgment on the Pleadings

The court finally turns to Liberty Mutual's Motion for Judgment on the Pleadings. In this document, Liberty Mutual does not ask the court to dismiss the claims against it, but rather only asserts that Plaintiffs have not stated a cause of action against the *other* two Defendants, WCSC and Jefferson Pilot. The ruling sought, then, is the same ruling which WCSC and Jefferson Pilot seek in their Memorandum in Opposition to Plaintiffs' Motion to Remand. For the reasons stated above, the court has found that Plaintiffs have no possibility of recovering from WCSC or Jefferson Pilot on any of their causes of action, and all claims against those two Defendants have been dismissed. Accordingly, the relief sought by Liberty Mutual's Motion for Judgment on the Pleadings has already been granted, and the Motion is therefore moot.

25

Since Liberty Mutual has not filed any pleadings pertaining to Plaintiffs' claims against it, however, the court need not and does not address the merits of these claims at this time, and these claims remain unaffected by this Order.

## CONCLUSION

For the foregoing reasons, the court hereby **ORDERS** that Elizabeth and Christopher Murphy's Motion to Remand this matter to state court is **DENIED**.  It is further **ORDERED** that Defendants WCSC and Jefferson Pilot's Motion to Dismiss is **GRANTED**.  It is further **ORDERED** that Defendant Liberty Mutual's Motion for Judgment on the Pleadings is declared **MOOT**.

**AND IT IS SO ORDERED**.

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**November 4, 2008**